UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MUTAZ M. ABUSHAWISH and
MHAMMAD A. ABU-SHAWISH,
     Plaintiffs,                   Case No: 20-CV-1914

v.

MILWAUKEE COUNTY, DANIEL O. HUMPHREYS,
MICHAEL GALEZEWSKI and EARNELL LUCAS,
       Defendants.

**DEFENDANTS MILWAUKEE COUNTY, DANIEL O. HUMPHREYS, MICHAEL GALEZEWSKI, AND EARNELL LUCAS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

     Defendants Milwaukee County, Daniel O. Humphreys, Michael Galezewski, and Earnell Lucas (collectively, "County Defendants"), by their attorneys, Crivello Carlson, S.C., respectfully submit the following Brief in Support of their Motion for Summary Judgment.

## INTRODUCTION

     Plaintiffs Mutaz M. Abushawish and Mhammad A. Abu-Shawish pursue three federal civil rights claims against the County Defendants under 42 U.S.C. § 1983, all of which should be dismissed at summary judgment for a number of reasons. For instance, Mutaz Abushawish pursues an unlawful seizure claim in relation to his arrest for hindering an officer, despite there being undisputed evidence supporting probable cause. Similarly, Mutaz's father, Mhammad Abu-Shawish, pursues an unlawful seizure of property claim in relation to the Milwaukee County Defendants' decision to tow the Plaintiffs' U-Haul with electronic equipment inside, even though the seizure was, undisputedly, carried out during a valid traffic stop and as a result of a lawful arrest.

Notably, Mr. Abu-Shawish never even personally dealt with the deputies or any of the County Defendants before, during, or after the date of the subject incident. Even to the extent that Plaintiffs' individual claims could survive summary judgment on the merits, the doctrine of qualified immunity decidedly stops these claims from going to a jury. Lastly, Plaintiffs present a vague and speculative claim for municipal liability against Milwaukee County and Sheriff Lucas for which there is simply no admissible evidence to support. The same is true in relation to any potential claim against Sheriff Lucas in his individual capacity, as he did not have the requisite degree of personal involvement necessary for liability under Section 1983. For these reasons, as outlined more fully below, the County Defendants are entitled to summary judgment.

## FACTS

All material, undisputed facts to support the County Defendants' Motion are stated and supported by citations to admissible evidence in the County Defendants' Proposed Findings of Fact, which is filed concurrently with their Motion, Brief, and evidentiary materials. The County Defendants will refer to those facts throughout their Brief with citations to "DPFF."[1]

In their Complaint, Plaintiffs allege the following against the County Defendants under 42 U.S.C. § 1983: (1) false arrest and unlawful seizure of property in violation of Plaintiffs' Fourth Amendment rights; (2) equal protection in violation of Plaintiffs' Fourteenth Amendment rights; and (3) municipal liability against Milwaukee County and Sheriff Lucas pursuant *Monell v. Dep't of Soc. Svcs. of New York City*, 436 U.S. 658 (1978). (Compl. ¶¶ 34-50.)

## ARGUMENT

**I. SUMMARY JUDGMENT IS APPROPRIATE IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND THE COUNTY DEFEDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

---

[1] Because both plaintiffs share the same last name, the County Defendants refer to them by their first names throughout their Brief.

2

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996). Further, "[w]hen the non-movant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict." *Lawrence v. Kenosha County*, 304 F. Supp. 2d 1083, 1087 (E.D. Wis. 2004).

## II.    MUTAZ ABUSHAWISH WAS NOT WRONGFULLY SEIZED AS A MATTER OF LAW.

### A.    Deputy Galezewski Was Not Personally Involved in the Decision to Arrest Mutaz.

The Seventh Circuit has "long held that liability under § 1983 must be predicated upon personal responsibility." *Brownlow v. Van Natta*, 2 F. App'x 516, 518-19 (7th Cir. 2001) (citing

3

*Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996)). To that end, "the Seventh Circuit established in *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971)[,] that before liability will attach under § 1983, a plaintiff must demonstrate the defendant's direct personal involvement in the claimed deprivation of constitutional rights." *Franklin v. Israel*, 558 F. Supp. 712, 715 (W.D. Wis. 1983) (emphasis added) (citing as *see also Stringer v. Rowe*, 616 F.2d 993, 1000-01 (7th Cir. 1980)).

Here, Deputy Galezewski was not personally involved in the decision to arrest Mutaz. In fact, Deputy Galezewski himself has stated that he was not part of the decision to arrest Mutaz. (DFF ¶ 53.) Further, the video shows Mutaz appear on the left of the screen, walking toward the U-Haul and Humphreys. (DFF ¶ 46.) At the time, Deputy Galezewski was still assisting Mr. Navarro into the back seat of Galezewski's squad car. See (DFF ¶ 52.) It is only after Deputy Humphreys and Mutaz make it over to the squad car that Deputy Galezewski walks over to assist Deputy Humphreys in handcuffing Mutaz. (DFF ¶ 54.) As soon as Mutaz is placed in handcuffs, Deputy Galezewski again walks away, leaving Mutaz with Deputy Humphreys. (DFF ¶ 55.) Deputy Humphreys then walks Mutaz off-camera towards his own squad car and places Mutaz in the back of the squad. (DFF ¶ 56.) Thus, based on the above evidence, it is undisputed that Deputy Galezewski was not involved in the decision to arrest Mutaz Abushawish.

### B. Even to the Extent Deputy Galezewski Was Involved, Neither He Nor Humphreys Violated the Fourth Amendment As a Matter of Law Because There Was Probable Cause for Mutaz's Arrest.

Probable cause, an absolute defense to false arrest, is a fluid concept to be analyzed from the officer's perspective. As defined by Chapter 63 of the Milwaukee County Municipal Code, resisting, obstructing, or hindering an officer is committed when a person knowingly resists, obstructs, hinders or in any way interferes with any officer while such officer is discharging

4

his/her duties, or offer or endeavor so to do, or in any manner assist any person in custody, or rescue or attempt to rescue any person from such custody. Milwaukee County Mun. Code § 63.05(2).

To establish a Fourth Amendment violation based on a theory of false arrest, Mutaz must show: (1) there was a seizure; and (2) the seizure was unreasonable. *See* U.S. CONST. Amend. IV. The County Defendants do not dispute that Mutaz was "seized" in the constitutional sense when he was arrested. Thus, the sole inquiry remaining for purposes of the Fourth Amendment is whether Mutaz's arrest for hindering an officer conduct under Milwaukee County Mun. Code §§ 63.01, 63.05(2) was reasonable.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). "[O]nce police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in hopes of uncovering potentially exculpatory evidence." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989). Probable cause is a "fluid concept that relies on the common-sense judgment of the officers based on the totality of circumstances." *U.S. v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). It "is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind.,* 320 F.3d 733, 742–43 (7th Cir. 2003).

At the heart of the probable cause analysis is "what the police know, not whether they know the truth . . . ." *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). Thus, in making the determination:

> [C]ourts evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer — seeing what he [or she] saw, hearing what he [or she]

5

heard." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992). The test, an objective one, is whether a reasonable officer would have believed the person had committed a crime. "If so, the arrest is lawful even if the belief would have been mistaken." *Id*. at 1057–1058.

*Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998).

Importantly, an eye witness's complaint or information is sufficient, in and of itself, to form probable cause. *See, e.g., Grimm v. Churchill*, 932 F.2d 674, 675–76 (7th Cir. 1991) (citing *Gramenos*, 797 at 439–40 ("Just as a single eyewitness's statement—without further investigation or a narration of contrary evidence—can support a warrant, so a single eyewitness's statement can support an indictment and a conviction.")). Moreover, officers are permitted to rely on law enforcement's resources in their investigation, such that "[o]bservations of fellow officers . . . engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *U.S. v. Ventresca*, 380 U.S. 102, 111 (1965); *U.S. v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officer under the collective knowledge doctrine."); *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010) ("Under the 'collective knowledge' doctrine, the officers who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of other officers."). Even a subsequent acquittal of the charged offense does not establish the lack of probable cause at the time of the arrest. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Humphrey v. Staszak*, 148 F.3d 719,728 (7th Cir. 1998).

Of course, probable cause "need not be based on evidence to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989), *cert. den'd*, 495 U.S. 931 (1990). Rather, probable cause

6

determinations turn "on the facts as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he [or she] saw, hearing what he [or she] heard." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (emphasis in original) (citation and internal quotation marks omitted), *cert. den'd*, 513 U.S. 1128 (1995).

### B. Officer Humphreys Undisputedly had Probable Cause to Arrest Mutaz Abushawish for Obstructing an Officer.

Plaintiffs admit that the traffic stop was valid, and that there was a valid arrest warrant out for the U-Haul driver, Navarro. (DFF ¶¶ 59-63.) Thus, there is no dispute that, for the entirety of the time Mutaz was on scene, Deputy Galezewski was lawfully carrying out a traffic stop and arrest and was discharging his duties as a law enforcement officer. Not only did Mutaz enter and interfere with the scene of this valid traffic stop and arrest two separate times, the second being in violation of an order from two deputy sheriffs, he used profanities directed toward the deputies multiple times. Further, Mutaz initiated all his contact with Deputies Galezewski and Humphreys.

For instance, the first time Mutaz was on the scene Deputy Galezewski told Mutaz to have a seat in his car multiple times without Mutaz's compliance. (DFF ¶¶ 14, 16.) In response to Galezewski's order telling Mutaz to have a seat in his car, Mutaz yelled, "Don't fucking yell at me, bro." (DFF ¶ 17.) Deputy Galezewski responded, "You can take off if you want, man" and Mutaz responded, "I'm not gonna take off, though." (DFF ¶¶ 18-19.) Deputy Galezewski again told Mutaz to have a seat in the car, to which Mutaz responded, "Damn." (DFF ¶ 20.) Galezewski once again told Mutaz to "sit down," which Mutaz finally complied with. (DFF ¶ 21.) However, shortly after Mutaz again begins yelling at Deputy Galezewski while seated in his car, Deputy Galezewski states, "Okay, now you can leave." (DFF ¶¶ 22-23.) Instead of leaving, Mutaz responded, "I don't want to leave, I want to talk to your supervisor," to which Galezewski

7

stated, "Leave." (DFF ¶ 24.) Galezewski also informed Mutaz that he was illegally parked. (DFF ¶ 25.) In fact, Galezewski informed Mutaz he was illegally parked and can leave a total of three times without Mutaz's compliance. (DFF ¶ 26.) Despite his noncompliance, Mutaz heard the officer's orders to leave the scene and understood them. (DFF ¶ 27.)

Deputy Humphreys then entered the scene as backup for Deputy Galezewski in response to Galezewski's call for assistance with an arrest, as Deputy Galezewski had not yet been able to complete the arrest with Mutaz's interruptions. (DFF ¶ 29.) At the time Humphreys arrived on the scene, Mutaz was on scene refusing to leave and his vehicle was stopped in a traffic lane in a relatively busy area. (DFF ¶ 30.) At this point, Deputy Galezewski asked Deputy Humphreys to give Mutaz a ticket for illegal parking. (DFF ¶ 31.) Galezewski stated, "either that or he can just take off." (DFF ¶ 32.) Humphreys then asked Mutaz if he wanted to take off or if he wanted to leave. (DFF ¶ 33.) Despite being given this option, the video shows that Mutaz continued to argue with both deputies until Humphreys yelled, "Do you want to take off or do you want to get cited?" To which Abushawish stated, "Okay, I wanna take off." (DFF ¶ 34.) Simultaneously, both deputies stated, "Then get out of here now" and "Go." (DFF ¶ 35.) In fact, the video clearly depicts Humphreys having to tell Mutaz to "go" five times before he actually complied and drove away from the scene. (DFF ¶ 26.) Further, Mutaz later admitted in his deposition that he only left the scene because the deputies told him they were going to give him a citation for illegal parking and not because the officers were ordering him to leave. (DFF ¶ 37.) Thus, even before Mutaz returns to the scene on foot, the deputies had enough information to arrest him for "interfere[ing]" or "hinder[ing]" them while they were undisputedly performing their lawful duties in conducting the valid traffic stop and arrest of Navarro. Mutaz's subsequent conduct only reinforced and continued the existence of probable cause when he returned to the scene.

8

Despite allowing Mutaz to leave the scene after interfering with a valid traffic stop and arrest, Mutaz shortly returned to the scene, this time on foot after having first parked his car at a gas station across the street. (DFF ¶ 39.) In the meantime, while Mutaz was away from the scene, Deputy Galezewski asked Mr. Navarro to step out of the U-Haul. (DFF ¶ 40.) While Navarro was walked over towards the squad car once again, he told Galezewski that he was "sorry about all that" and gestured toward where Mutaz's vehicle had just been parked. (DFF ¶ 41.) Galezewski responded, "I get that you guys are trying to go to somebody's wedding, it ain't my—it ain't my intention to ruin somebody's wedding or nothing, alright?" (DFF ¶ 42.) Galezewski then informed Navarro that there was a warrant for his arrest, and explained what the next steps would be as far as detention and then placed Navarro in the squad car. (DFF ¶ 43.)

However, shortly after Navarro was taken to the back of Galezewski's squad car, the video shows Humphreys see something toward the left of the camera and he began walking toward it, saying something to the effect of "What are you doing?" (DFF ¶ 46.) As Mutaz appeared to the left of the screen, walking toward the U-Haul and Humphreys, the video depicts Deputy Humphreys telling Mutaz to leave the scene or he would be arrested, but he refused. (DFF ¶ 47.) Mutaz was told to leave the scene more than ten times between the two times he arrived on the scene. (DFF ¶ 48.) Mutaz was then placed under arrest and placed in the back seat of Humphreys' squad car, transported to the Milwaukee County Jail, and turned over to the jail staff. (DFF ¶ 50.)

Deputy Humphreys' firsthand observations of Mutaz Abushawish would have led a reasonable officer in his position to believe that he and Deputy Galezewski would not be able to complete their valid traffic stop unless they removed Mutaz from the scene. (DFF ¶¶ 57-58.) At a bare minimum, Mutaz's conduct could have led Deputy Humphreys to believe that Mutaz was

Case 2:20-cv-01914-LA    Filed 12/10/21    Page 9 of 29    Document 14

"hinder[ing]" or "in any way interfere[ing]" with Deputy Galezewski's valid traffic stop and arrest of Navarro. Further, it is undisputed that Deputy Galezewski was discharging his duties as a law enforcement officer—by lawfully arresting Navarro—at the time Mutaz initiated contact with Galezewski. (DFF ¶ 64.) Here, Deputy Humphreys reasonably interpreted that Mutaz's multiple interferences with the deputies' valid stop and subsequent arrest of Mr. Navarro were both interfering with and obstructing Deputy Galezewski's undisputedly lawful stop and subsequent arrest of Navarro. Thus, Deputy Humphreys undisputedly had probable cause to arrest Mutaz for disorderly conduct and resisting.

## III.    MUTAZ AND MHAMMAD'S PROPERTY WAS NOT WRONGFULLY SEIZED AS A MATTER OF LAW.

### A.    Deputy Humphreys Was Not Personally Involved in the Decision to Tow or Seize the Property.

Plaintiffs have not demonstrated that Deputy Humphreys was personally involved in the decision to seize the U-Haul and the property contained within it. *See Brownlow*, 2 F. App'x at 518-19; *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Franklin*, 558 F. Supp. at 715; *see also Stringer*, 616 F.2d at 1000-01. In fact, the video from Deputy Galezewski's video shows otherwise. For instance, Deputy Galezewksi made the decision to tow the U-Haul with the property inside it before Deputy Humphreys arrived on the scene (and before Mutaz was on the scene). (DFF ¶ 66.) The video shows Deputy Humphreys arriving on the scene at eleven minutes and twenty-nine seconds. (DFF ¶ 29.) Thus, Deputy Humphreys could not have been involved in the decision to tow the U-Haul and the speakers inside as he was not present on the scene at the time the decision was made.  Accordingly, Deputy Humphreys is entitled to judgment as a matter of law on Plaintiffs' Fourth Amendment claim related to the U-Haul vehicle and property.

### B.    Neither Humphreys Nor Galezewski Violated the Fourth Amendment Because Towing the Vehicle Was Not an Unlawful Seizure.

10

In order to constitute a Fourth Amendment violation, a governmental seizure must be unreasonable. *Belcher v. Norton*, 497 F.3d 742, 748 (7th Cir. 2007). "The 'test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . [it] requires careful attention to the facts and circumstances of each particular case.'" *Belcher*, 497 F.3d at 748 (quoting *Donovan v. City of Milwaukee*, 17 F.3d 944, 949 (7th Cir. 1994)). Determining whether the "seizure" of property was "unreasonable" requires a "balancing of governmental and private interests." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985).

Regarding an impoundment of a vehicle, the Seventh Circuit has held that "[a]n impoundment is permissible so long as it is supported by probable cause or it is 'consistent with the police role as "caretaker" of the streets.'" *Holm v. Village of Coal City*, 345 Fed.Appx. 187 (2009) (quoting *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996). Further, the Seventh Circuit has held that deputies who ordered a vehicle impounded and towed "were entitled to do so either in accordance with the sheriff's department's standard operating procedure or as a facet of their community care-taking function." *Scott v. Archey*, 99 Fed. Appx. 62, *63, 2004 WL 179218 (7th Cir. 2004). In *Scott*, the court noted that the sheriff's department generally tows vehicles left in public areas when—as was true in both that particular case as well as this case— the driver is arrested and no licensed driver is available to remove the vehicle. *Id*. According to the court in *Scott*, such vehicles are also subject to removal as part of the arresting officers' community care-taking function. *Id*.

Additionally, the Seventh Circuit has held that the decision to impound a vehicle is proper incident to an arrest where the vehicle would otherwise have been left unattended, possibly for an extended period, in close proximity to the traveled portion of a busy, high speed roadway. *U.S. v. Griffin*, 729 F.2d 475 (7th Cir. 1984). Further, courts have noted that

11

impounding a vehicle can be done for the protection of the vehicle being towed and its contents from the likelihood of damage, theft, and vandalism. *See id*.; *see also, e.g.*, *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *United States v. Balanow*, 528 F.2d 923, 924 (7th Cir. 1976). The impounding of the vehicle is considered part of the officer's community caretaking function, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 443 (1973). In fact, the impounding of an automobile has been upheld as proper when the automobile is in violation of a parking ordinance, *see South Dakota v. Opperman*, 428 U.S. 364, 373 (1976), a state forfeiture statute applies, *see Cooper v. California*, 386 U.S. 58, 61 (1967), the driver is incapacitated, *see Cady*, 413 U.S. at 436, or the driver's license is suspended, *see Balanow*, 528 F.2d at 924.

Here, like in *Holm*, *Scott*, and *Balanow*, it is undisputed Deputy Galezewski made the decision to tow the U-Haul when there was no person on scene with a valid driver's license to safely remove the U-Haul. (DFF ¶ 66.) In fact, Deputy Galezewski contacted a towing company before Mutaz ever arrived on scene. (DFF ¶¶ 9-11.) Further, like in Scott, Deputy Galezewski was following the Milwaukee County Sheriff's Department practice that, at the time, was to tow a vehicle if there was no licensed driver available at the time of the stop to drive the vehicle away from the scene. (DFF ¶ 65.) Deputy Humphreys conducted the inventory of the U-Haul both to ensure that there was nothing dangerous inside the U-Haul and to ensure that any property inside it is protected and accounted for, which was part of his community caretaking function, as allowed in *Scott*. (DFF ¶ 57.) These facts undisputedly show that Deputy Galezewski had probable cause to tow the U-Haul before Mutaz even arrived on the scene.

12

Further, Mutaz's arrival on the scene (after the call to tow the U-Haul had already been made) did not alter the fact that Deputy Galezewski had probable cause to tow the U-Haul. Upon Mutaz's arrival on the scene, he parked illegally and did not attempt to explain who he was or what his purpose was, nor did he attempt to present the U-Haul contract to Deputy Galezewski at the time of his arrival. *See* (DFF ¶¶ 11-14.) In fact, Mutaz did not explain *anything* to Deputy Galezewski, but instead immediately asked whether he could take the U-Haul without any additional information or context. (DFF ¶ 14.); *See Harney v. City of Chicago*, 702 F.3d 916, 922-23 (7th Cir. 2012) ("[T]he court's inquiry is limited to what the officer knew at the time of the arrest and not what has been gained from hindsight."). Not only did he expect Deputy Galezewski to immediately hand over property that was involved in a valid traffic stop and was not yet determined to be the Mutaz's property, he began to argue with—and even used profanities toward—Deputy Galezewski about whether or not he could take the U-Haul. (DFF ¶¶ 16-17.) However, it was not until Mutaz was already seated in his car—after several commands from Galezewski to have a seat in his car went ignored—and Galezewski had already begun walking away from Mutaz's vehicle that Mutaz began yelling out of his driver's side window. (DFF ¶ 23.) At this point, Deputy Galezewski tells Mutaz, "Okay, now you can leave." In other words, after Galezewski had begun walking away to continue on with the traffic stop (and subsequent arrest of Navarro) Mutaz *again* interfered, necessitating Galezewski's order for him to leave the scene.

Thus, as the towing of the U-Haul was properly done pursuant to the case law and the Milwaukee County Sheriff's Department's policy on towing vehicles where there is no person with a valid driver's license on scene, neither Deputy Galezewski nor Deputy Humphreys was in violation of the Fourth Amendment in ordering the tow as a matter of law.

13

## IV.  PLAINTIFFS HAVE ABANDONED THEIR EQUAL PROTECTION CLAIM.

In response to Defendants' First Set of Written Interrogatories to Plaintiffs, Plaintiffs indicated that the equal protection is no longer being pursued by Plaintiffs and would be dismissed. *See* (Haggenjos Aff. ¶ 7.) Thus, based on Plaintiffs' representation in discovery that they are abandoning their Equal Protection claim, the County Defendants do not address the Equal Protection and respectfully request that the Court dismiss it on its merits and with prejudice.

## V.  BOTH DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY.

### A.  Qualified Immunity Shields Officers Against Section 1983 Liability Even in Instances Where Officers are Reasonably Mistaken.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff*, 572 U.S. at 778–79).   A prior case exactly on point is not necessarily required.   *See, e.g., Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).   However, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his or her] shoes would have understood that he [or she] was violating it.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 739–40).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).   "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"   *Sheehan*, 135 S. Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 743).

14

The plaintiff always bears the burden of establishing the existence of a clearly established constitutional right violated by the public official. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993).

In *Sheehan*, the Supreme Court criticized the Ninth Circuit for misreading prior Supreme Court precedent regarding qualified immunity. Specifically, the Court criticized the Ninth Circuit for defining the right in question—there, the Fourth Amendment right to be free from unreasonable searches and seizures—at too high a level of generality:

> [N]othing in our cases suggests the constitutional rule applied by the Ninth Circuit. The Ninth Circuit focused on *Graham v. Conner*, but *Graham* holds only that the "objective reasonableness" test applies to excessive-force claims under the Fourth Amendment. That is far too general a proposition to control this case. "We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.

135 S. Ct. at 1775–76 (internal citations omitted). The Supreme Court repeated this admonition to lower courts again in 2015. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). As the Court framed the issue in *Mullenix*:

> The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

136 S. Ct. at 308 (internal quotations and citations omitted) (emphasis in original).

15

Even if the contours of the federal right in question are found to have been clearly delineated at the relevant time, a public official may still enjoy qualified immunity if it was objectively reasonable for the official to believe that his or her actions did not violate a federal right. In fact, public officials are shielded from suit even where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, "if officers of reasonable competence could disagree . . . immunity should be recognized." *Id.*

As relevant here, the deputies are entitled to qualified immunity under 42 U.S.C. § 1983 unless the unlawfulness of their conduct was "clearly established at the time." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). To be clearly established, a legal principle must be "settled law," and it must clearly prohibit the officers' conduct in the particular circumstances before them. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Saucier*, 533 U.S. at 202. In the Fourth Amendment context, "a body of relevant case law" is necessary to "'clearly establish' the answer" with respect to probable cause. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see also D.C. v. Wesby*, 138 S. Ct. 577, 581 (2018). Notably, in the context of an alleged wrongful arrest, this Circuit considers whether the arresting officer had "arguable probable cause." That is, even assuming that actual probable cause did not exist at the time of an arrest, officers are protected by qualified immunity because they acted with a reasonable belief as to the existence of probable cause. *See Fleming v. Livingston County, Ill.*, 674 F.3d 874, 879–80 (7th Cir. 2012); *Gibbs v. Lomas*, 755 F.3d 529, 540 (7th Cir. 2014).

"[A] defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed." *Fleming*, 674 F.3d at 880 (internal quotes omitted). This is often termed "arguable probable

16

cause," and although it is similar to the probable-cause analysis, it acts as an additional layer of protection from § 1983 liability for officers. *See id.*; *Gibbs*, 755 F.3d at 540; *see also, e.g.*, *Forman v. Richmond Police Department*, 104 F.3d 950, 960–61 (7th Cir. 1997) (holding that an officer was insulated from liability even where the prosecutor later determined that there was not probable cause for the arrest and dropped the charges); *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 622–23 (7th Cir. 2010) ("To form a belief of probable cause, an arresting officer is not required . . . to act as a judge and jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute."). "[W]hether arguable probable cause supports qualified immunity 'is a pure question of law' to be decided by the court." *Cibulka v. City of Madison*, 992 F.3d 633, 639 n.2 (7th Cir. 2021) (internal quotes and citations omitted).

"Arguable probable cause is established when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Fleming*, 674 F.3d at 879–80; *see also Lowrance v. Pflueger*, 878 F.2d 1014, 1017 (7th Cir. 1989) ("In a § 1983 action based upon a violation of the fourth amendment, it is not sufficient to establish that an arrest warrant was 'defective' . . . or that an arrest was made without probable cause."); *Spiegel v. Cortese,* 196 F.3d 717, 723 (7th Cir. 2000) ("[T]he reviewing court will ask whether an official 'acted reasonably under the settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact.'"); *Humphrey,* 148 F.3d at 725 (holding that arguable probable cause exists when a reasonable officer "in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed

that probable cause existed in light of well-established law.").  Therefore, the test is an objective one.  *Fleming*, 674 F.3d at 877.

In *Fleming*, for instance, the Seventh Circuit held that an officer was entitled to qualified immunity where he arrested a man that appeared to match the description of a sexual assault suspect, even though there were discrepancies in the officer's testimony.  674 F.3d at 881. Specifically, the plaintiff in *Fleming* argued that the officer fabricated probable cause based on indications that his testimony regarding the time between interviewing witnesses and spotting the suspect was questionable.  *Id.*  Noting that there was no evidence that the officer recklessly or deliberately falsified evidence, the Court held that even if the officer had fabricated evidence, the falsification must have been "material" to the finding of probable cause.  *Id.*

**B.**     **Deputy Humphreys is Entitled to Qualified Immunity.**

First, the Deputy Humphreys is entitled to qualified immunity as to Mutaz Abushawish's false arrest claim.  A reasonable officer in Deputy Humphrey's position—dispatched to a scene for backup to Deputy Galezewski and dealing with an unknown person who enters the scene of a valid traffic stop and arrest, not once, but twice—could have believed that Mutaz was "hinder[ing]" or "in any way interfere[ing]" with the traffic stop and arrest.   In fact, both deputies attempted to avoid arresting Mutaz by first requesting and then demanding that he leave the scene of the traffic stop, informing him that he was illegally parked in traffic and that he could either leave the scene or receive a citation for illegal parking. (DFF ¶¶ 25-26, 31-25.) It was only once Mutaz once again appeared on scene, this time on foot, that Deputy Humphreys made the reasonable decision to arrest Mutaz for interfering with the traffic stop and arrest of Navarro. (DFF ¶¶ 47, 50.)

18

Here, it is the totality of the circumstances which entitles Deputy Humhreys to qualified immunity as a matter of law. For instance, when Deputy Galezewski lawfully stopped the U-Haul pursuant to a traffic violation, he was the only officer on the scene and was conducting a traffic stop at night in a relatively busy area. (DFF ¶¶ 5, 30.) As soon as he questioned Navarro and looked up his information, he became aware that not only did Navarro have a suspended driver's license, he also had a warrant out for his arrest. (DFF ¶ 9.) Shortly learning about the warrant for Navarro, however, an unknown vehicle pulled up on the scene, illegally parked, and an unknown man proceeded to walk quickly toward Deputy Galezewski's squad car, which is where Deputy Galezewski was at the time. (DFF ¶¶ 11, 13.) At this point, the unidentified person immediately began to ask about the U-Haul and whether he can take it, despite the fact that Galezewski does not know who this person is or whether he was the person who actually rented the vehicle. (DFF ¶ 15.) Deputy Galezewski began to escort the unidentified person back to his vehicle and told him to have a seat in his car, while he and the person continued to argue about whether the person can take the U-Haul. (DFF ¶¶ 14-15.) After several back-and-forths between Galezewski and the unidentified person, Galezewski again told the person to have a seat in his car, which he repeated several additional times at a louder volume before the person stopped talking. (DFF ¶ 16.) Despite the fact that the person eventually got into his vehicle, it took the involvement of a second sheriff's deputy, Deputy Humphreys, to threaten to cite the person for illegally parking (and then telling him to leave several more times) before the person actually left the scene. (DFF ¶¶ 31-36.)

In other words, Galezewski—and later Humphreys—were dealing with an unidentified adult male who was being uncooperative and did not have any business being on the scene during a valid traffic stop of another driver. Further, not only did the officers give the person—

now known as Mutaz Abushawish—the chance to leave the scene without receiving a citation, when Mutaz came back to the scene (after jaywalking across the street), Humphreys again gave him an opportunity to leave by telling him to go, which again Mutaz ignored. It was only after the repeated interferences with the valid traffic stop—coupled with many, many chances to leave by the officers—that Deputy Humphreys made the decision to arrest him so that Galezewski could carry on with the arrest of Navarro.

Deputy Humphreys' firsthand observations of Mutaz Abushawish could have led a reasonable officer in his position to believe that he and Deputy Galezewski would not be able to complete their valid traffic stop unless they removed Mutaz from the scene. (DFF ¶ 57.) At the very least, Humphreys' observations and interactions with Mutaz could have led reasonable a reasonable deputy in his position to believe that Mutaz had "hinder[ed]" or "in any way interfere[d]" with Deputy Galezewski's traffic stop and arrest of Navarro.

Further, even to the extent Deputy Galezewski was involved in the arrest of Mutaz Abushawish, he is entitled to qualified immunity for the same reasons as Deputy Humphreys. Thus, both Deputies Humphreys and Galezewski are entitled to qualified immunity regarding Plaintiff's false arrest claim.

### C. Deputy Galezewski is Entitled to Qualified Immunity.

Second, Deputy Galezewski is entitled to qualified immunity as to Mhammad's wrongful seizure of property claim. At the time Deputy Galezewski made the decision to tow the U-Haul and subsequently made a request for a tow truck to come to the scene, there was no person in the U-Haul or on the scene in possession of a valid driver's license. (DFF ¶ 66.) Further, Deputy Galezewski was following a Milwaukee County policy at that time, which was to tow a vehicle that was illegally parked and there was no valid driver present on the scene at the time of the

20

valid traffic stop. (DFF ¶ 65.) Deputy Galezewski's firsthand observations of the scene and knowledge of the fact that Mr. Navarro's license was suspended and there were no other drivers present at the time could have led a reasonable officer in his position to believe that the U-Haul should be towed. Deputy Galezewski's mere refusal to cancel the tow truck after Mutaz Abushawish appeared on scene and began arguing with officers did not violate clearly established law, particularly because Deputy Galezewski had to shift his focus to completing Navarro's arrest after the tow truck had been ordered. Under these circumstances, a reasonable officer in Deputy Galezewski's position could have believed that it was reasonable under the Fourth Amendment to continue on with the arrest of Navarro and allow the U-Haul to be towed, even after he was approached by Mutaz on scene.

Further, even to the extent Deputy Humphreys was involved in the towing of the U-Haul, he is entitled to qualified immunity for the same reasons as Deputy Galezewski. Thus, both Deputies Humphreys and Galezewski are entitled to qualified immunity regarding Plaintiff's wrongful seizure of property claim.

## VI.    THE *MONELL* CLAIM FAILS AS A MATTER OF LAW.

### A.    Plaintiffs' *Monell* Claim Fails as a Matter of Law Because They Cannot Establish a Constitutional Deprivation.

To maintain a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must first establish that he or she actually suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994); *see also Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of [an] individual police officer, the fact that the departmental regulations might have *authorized* [unconstitutional conduct] is quite beside the point.").

Such basis for dismissal is well recognized. *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir.

21

1992) ("[B]ecause [the officer] did not violate [the plaintiff's] constitutional rights, there is no basis for liability" against the municipality.); *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiff's claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."); *Thompson*, 33 F.3d at 859 (explaining that if individual officers did not violate plaintiff's constitutional rights, the municipality cannot be held liable on a *Monell* claim); *Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) ("[a]ssum[ing] (with some skepticism) that a constitutional violation occurred" in order to proceed with a *Monell* analysis).

In limited circumstances, courts consider an exception where a constitutional violation <u>is established</u> but individual liability is precluded solely on qualified immunity grounds. *See Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 306 (7th Cir. 2009) (reasoning that the *Monell* claim was not barred because a constitutional violation was established and individual defendants were dismissed solely based on qualified immunity). This limited exception does not apply here. As explained above, Plaintiffs cannot prove that their constitutional rights were violated. For this reason alone, Plaintiffs' *Monell* claim fails as a matter of law and should be dismissed with prejudice.

**B.** **Plaintiffs are Unable to Produce Evidence Showing the County was Deliberately Indifferent in Maintaining a Widespread Custom or Practice that Caused Plaintiffs' Alleged Constitutional Injuries.**

Plaintiffs plead, in a cursory manner, that the incident occurred due to Milwaukee County's failure to adequately supervise, discipline, and/or train its employees." *See* (Compl. at ¶ 47.) Plaintiffs' bare assertions are not enough to maintain a *Monell* claim against the County.

A municipality can be found liable under Section 1983 only if the governmental body itself "subjects" a person to a deprivation of constitutional rights or "causes" a person "to be

22

subjected" to such deprivation. *Monell*, 436 U.S. at 692. Local governments are responsible only for "their own illegal acts." *Id.* at 665–83. They cannot be held vicariously liable for the acts of their employees. *Brown*, 520 U.S. at 403.

To state a claim under *Monell*, Plaintiffs must plead "'factual content that allows the court to draw the reasonable inference'" that the County "maintained a policy, custom, or practice" that caused his alleged constitutional deprivations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Aschcroft*, 556 U.S. at 678). "Such factual content must be independent of allegations that merely state legal conclusions or recitations of the cause of action." *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830, 841 (N.D. Ill. 2014). The Complaint here does not meet this standard. Like in *McCauley*, "[m]any of the alleged 'facts' are actually legal conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss." 671 F.3d at 617. The Complaint here does not contain a single fact tending to show that Plaintiffs have a plausible *Monell* claim.

"There is no respondeat superior liability for municipalities under 42 U.S.C. § 1983." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019). Rather, a plaintiff who seeks to impose municipal liability under Section 1983 must prove that an "official municipal policy" caused the complained-of-injury. *Monell*, 436 U.S. at 691. To do so:

> a plaintiff must prove (1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amount to an unconstitutional practice so permanent, well-settled, and known to [the municipality] as to constitute a "custom or usage" with force of law; or (3) the conduct was caused by a decision of a municipal policymaker with final policymaking authority in the area in question.

*Abraham*, 13 F. Supp. 2d at 880; *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011). Stabenow "must demonstrate that the 'deliberate action attributable to [the County] itself is the "moving

23

force"' behind the deprivation of Plaintiff's constitutional rights." *Johnson v. Cook County*, 526 F. App'x 692, 695 (7th Cir. 2013) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 399 (1997) (citing *Monell*, 436 U.S. at 694)).

Further, "*Monell* claims are subject to the pleading standard set out by the Supreme Court in . . . *Twombly* and *Iqbal*, and boilerplate allegations or legal conclusions are insufficient to survive a Rule 12(c) motion." *Braun v. Abele*, No. 15-CV-252 JPS, 2015 WL 3904960, at *5 (E.D. Wis. June 25, 2015) (internal citations and quotations omitted); *see also McCauley*, 671 F.3d at 616-17. "Because a *Monell* claim is complex, more factual specificity is required to sustain a *Monell* claim. *Braun*, 2015 WL 3904960, at *5 (emphasis added). "This specificity is necessary to satisfy the rigorous standards of culpability and causation required for municipal liability." *Id.* (internal quotations omitted).

All of Plaintiffs' *Monell* allegations relate to training, supervision, and discipline. (Compl. ¶ 47.) As discussed below, these allegations fail as a matter of law.

First, the undisputed evidence shows that the County's training was constitutional as a matter of law. Plaintiffs broadly allege that the incident occurred as a result of the County's "failure to adequately supervise, discipline, and/or train its employees." (Compl. at ¶ 47.) However, the undisputed facts show that both of the deputies were well trained and relied on their fundamental training and experience in executing their duties during their encounter with Plaintiff Mutaz.

Failure-to-train and failure-to-supervise claims are "tenuous" forms of *Monell* liability and available only in limited circumstances. *Ruiz-Cortez*, 931 F.3d at 599; *Cornfield v. Consolidated High Sch. Dist.*, 230, 991 F.2d 1316, 1327 (7th Cir. 1993); *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997). "[I]nadequacy of police training may serve as the basis for §

1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 498 U.S. 378, 388 (1989). Such deliberate indifference can be shown in one of two ways: (1) failing to train municipal employees "to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation;" and (2) failing "to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003). "Flawed policies or training amounts to deliberate indifference only if 'the need for more or different [policies or] training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rivera v. City of Madison*, 16-cv-bbc, 2018 WL 654477, *12-13 (W.D. Wis. Jan. 31, 2018) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Plaintiffs' allegations and the evidentiary record are insufficient to lead to such a showing.

Not only do Plaintiffs fail to plead any facts to support their claims that the County failed to adequately train and/or supervise its employees, they plead no facts that would support a finding that the County was deliberately indifferent to the consequences of these alleged inadequacies. (Compl. ¶¶ 46-50.) Rather, they allege that "Milwaukee County and Sheriff Lucas were deliberately indifferent to the rights of Abushawish and Abu-Shawish." (Compl. ¶ 49.) These are legal conclusions, not facts. In that way, "Plaintiff[s] succeed[] in repeating all of the trigger words required of a *Monell* claim but absolutely no factual content . . . ." *Foy v. City of Chicago*, No. 15 C 3720, 2016 WL 2770880, at * 9 (N.D. Ill. May 12, 2016).

Further, the undisputed evidence shows that the individual County Defendants were well trained, particularly on the policies and procedures of the Milwaukee County Sheriff's

Department. (DFF ¶ 75.) Deputy Humphreys has been a Sheriff's Deputy with the Milwaukee County Sheriff's Department since May of 2018. (DFF ¶ 76.) However, Deputy Humphreys has been a law enforcement officer for fifteen years. (DFF ¶ 77.) Prior to being employed with the Milwaukee County Sheriff's Department, Deputy Humphreys was first employed by the City of Greenfield as a police officer and then later by the City of Genoa as a police officer. (DFF ¶ 78.) When Deputy Humphreys was hired by the Milwaukee County Sheriff's Department, he went through an orientation to the agency, which included Milwaukee County Sheriff's Department policy and procedure review. (DFF ¶ 79.) Deputy Galezewski has been employed with the Milwaukee County Sheriff's Department for nine and a half years. (DFF ¶ 80.) Deputy Galezewski first began his employment with Milwaukee County as a correctional officer and later became a sheriff's deputy in 2016. (DFF ¶ 81.)

Thus, Plaintiffs' allegation and the undisputed evidence fail to show any deliberate indifference on the part of the County in training its officers. Rather, the undisputed evidence shows that the individual County Defendants received significant training in a range of topics that were directly applicable to and helpful with the encounter with Plaintiff Mutaz. Moreover, there is simply no evidence that any specific deficiency in training or discipline led to a constitutional deprivation of any kind. Accordingly, the failure-to-train claim fails as a matter of law.

## VII. THE INDIVIDUAL CAPACITY CLAIM AGAINST SHERIFF LUCAS SHOULD BE DISMISSED FOR NO PERSONAL INVOLVEMENT.

At the outset, if the Court finds that Deputies Galezewski and Humphreys did not violate Plaintiffs' constitutional rights as a matter of law, then Plaintiffs' claims against Sheriff Lucas necessarily fails as a matter of law, too. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586,

597 (7th Cir. 1997). Further, as explained below, Plaintiffs' claim against Sheriff Lucas fails as a matter of law even on its own merits.

### A. The Undisputed Evidence Shows That Sheriff Lucas Was Not Personally Involved With the Subject Incident.

Here, Plaintiff cannot submit any evidence to show that Sheriff Lucas was personally involved with the subject incident. *See Brownlow*, 2 F. App'x at 518-19; *Starzenski*, 87 F.3d at 880; *Franklin*, 558 F. Supp. at 715; *see also Stringer*, 616 F.2d at 1000-01. Therefore, because Plaintiff cannot meet its burden of proof as to this claim, the individual capacity claim should be dismissed for no personal involvement.

### B. Plaintiffs' Supervisory Liability Claims Fail as a Matter of Law.

In general, "a defendant must have been personally responsible for the deprivation of the right at the root of a § 1983 claim for that claim to succeed." *Backes v. Village of Peoria Heights*, Ill., 662 F.3d 866, 869 (7th Cir. 2011) (internal quotations omitted). However, an exception to this general rule exists where a "supervisor may still be personally liable for the acts of [their] subordinates if [they] approve of the conduct and the basis for it." *Id.* at 870 (internal quotations omitted). As such, "[s]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* (internal quotations omitted).

Here, Plaintiffs' supervisory claim fails for many of the same reasons that Plaintiff's *Monell* claim fails. Plaintiffs cannot produce any admissible evidence that Sheriff Lucas knew about Deputy Galezewski's and Deputy Humphreys' encounter with Mutaz Abushawish and his father's sound equipment, much less that the Sheriff facilitated, approved, condoned, or turned a blind eye to the encounter.

### VIII. THE CLAIM FOR PUNITIVE DAMAGES FAILS AS A MATTER OF LAW.

Punitive damages are only recoverable in Section 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 35, 51 (1983); *Woodward v. Correctional Medical Services of Illinois, Inc*., 368 F.3d 917, 930 (7th Cir. 2004). The Seventh Circuit has interpreted the standard jury instruction for Section 1983 punitive damages as placing the defendant's conduct into one of two categories: (1) "the defendant actually derives satisfaction from hurting the plaintiff"; and (2) "the defendant, while not having any particular desire to hurt the plaintiff, tramples on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims." *Soderbeck v. Burnett County, Wis*., 752 F.2d 285, 289-90 (7th Cir. 1985). In *Soderbeck*, the court went on to illustrate the two categories as follows:

> If a man sets fire to a house intending to kill the occupants, he is a deliberate murderer; if he sets fire to a house he knows to be occupied, but does so to warm himself rather than to kill the occupants, he is a reckless murderer. But he is a murderer in either case, and would be subject to punitive damages in a suit for wrongful death.

*Id*.

Here, Plaintiffs cannot show that Deputy Galezewski or Deputy Humphreys were "motivated by evil motive or intent" nor that they acted with "reckless or callous indifference to [their] federally protected rights." *Smith*, 461 U.S. at 56. Even a cursory review of both deputies' squad car videos—which show them allowing Mutaz to leave the scene before he was arrested, and which shows the deputies responding to a routine traffic stop involving a driver with a suspended license—shows that Plaintiffs' punitive damages claim is wholly without merit. Further, Deputy Galezewski's friendly demeanor towards Mr. Navarro and, initially towards Mutaz himself until Mutaz began disobeying direct orders from a law enforcement officer, obstructing a valid traffic stop, and using profane language toward a police officer (despite all

Case 2:20-cv-01914-LA   Filed 12/10/21   Page 28 of 29   Document 14

this Deputy Galezewski remained respectful and professional toward Mutaz) renders their punitive damages claim against the deputies borderline absurd. Plaintiffs are unable to come forth with any admissible evidence that even comes close to showing Deputies Galezewski and Humphreys were "motivated by evil motive or intent" or that they acted with "reckless or callous indifference to [their] federally protected rights." *Smith*, 461 U.S. at 56.

Accordingly, the County Defendants are entitled to judgement as a matter of law on Plaintiffs' punitive damages claim.

## CONCLUSION

Based on the foregoing, the County Defendants respectfully request that their Motion for Summary Judgment be granted, dismissing Plaintiffs' claims in their entirety, with prejudice, on the merits, and with costs.

Dated this 10th day of December, 2021.

By: s/ Micaela E. Haggenjos
SAMUEL C. HALL, JR.
State Bar No. 1045476
BENJAMIN A. SPARKS
State Bar No. 1092405
MICAELA E. HAGGENJOS
State Bar No. 1118840
Attorneys for Defendants
Milwaukee County, Deputies Michael Galezewski and Daniel Humphreys, and Sheriff Earnell Lucas
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Phone: (414) 271-7722
Fax: (414) 271-4438
E-mail: shall@crivellocarlson.com
E-mail: bsparks@crivellocarlson.com
E-mail: mhaggenjos@crivellocarlson.com

29